IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SALLAH ABDULLA | : | CIVIL ACTION |
| | : | |
| v. | : | No. 23-3914 |
| | : | |
| LISA PITTAOULIS | : | |

**MEMORANDUM**

**Judge Juan R. Sánchez**                                                  **February 20, 2026**

Pro se Plaintiff Sallah Abdulla brings this action under 42 U.S.C. § 1983 against

Philadelphia Police Lieutenant Lisa Pittaoulis, alleging violations of his Fourth, Fifth, and

Fourteenth Amendment rights.  Abdulla's claims against Lt. Pittaoulis stem from her role in his

allegedly unlawful eviction from a property where he was residing in October 2021.  Lt. Pittaoulis

has moved for summary judgment, arguing she is entitled to qualified immunity because, at the

time Abdulla was forced to leave the property, she reasonably believed he was an Airbnb guest

who overstayed his reservation and there was no clearly established law that an Airbnb rental gives

rise to a landlord-tenant relationship, entitling the tenant to eviction protections under state and

federal law.  The Court agrees Lt. Pittaoulis is entitled to qualified immunity because, viewing the

facts in the light most favorable to Abdulla, it would not have been clear to a reasonable officer in

her position that Abdulla was a tenant of the property who had to be formally evicted.  Summary

judgment will therefore be granted in her favor.

**FACTS**[1]

---

[1] The summary judgment record in this case consists of documentary exhibits submitted by the parties and body-worn camera footage of Abdulla's interactions with police on October 8, 2021 and November 5, 2021.  The Court has also consulted the dockets of the related state-court cases Abdulla filed concerning his eviction, which are referenced in his summary judgment opposition. *See Wheeler v. Wheeler*, 639 F. App'x 147, 150 n.10 (3d Cir. 2016) (noting a district court "may take judicial notice of public records, including records of judicial proceedings").  Finally, the Court has considered the "Statement of Facts" included in Abdulla's opposition brief (Dkt. No. 21

On October 8, 2021, two officers from the Philadelphia Police Department ("PPD")—identified only as Officers Friel and Fernandez—responded to a 911 call at 1528 Mascher Street in Philadelphia, a multi-unit property where Abdulla had been residing.  Upon arrival, the officers first spoke with the complainant, Budo Bunul,[2] who told them an Airbnb guest (Abdulla) had broken back into the property and was refusing to leave.  *See* Def.'s Ex. B at 1:05-1:20.[3]  Bunul stated Abdulla no longer had any belongings at the property because a friend had removed them, and he claimed Abdulla had attempted to hurt him by pushing him to the floor and hitting him on the head with a dumbbell.  *Id.* at 1:10-1:25.  In response to the officers' questions, Bunul confirmed Abdulla was an Airbnb guest and stated Abdulla was supposed to leave several months earlier but had "overstay[ed] his stay," had not "paid anything," and did not have a lease.  *Id.* at 2:55-3:10. Bunul claimed Abdulla's friend had asked him to give Abdulla more time, but Abdulla was causing problems with the housekeeping staff and other guests, and was interfering with other guests' reservations.  *Id.* at 3:10-3:35.  He also explained that although the door code and lock had been changed, Abdulla had gotten back into the property.  *Id.* at 3:35-3:50.

The officers then spoke separately with Abdulla, who provided his version of events. Abdulla told the officers he was renting a room at the property and paying by Zelle, a digital

---

at 3-6) insofar as those allegations, although unsworn, may be relevant to determining whether to grant Abdulla an opportunity to submit proper affidavit.  *See Lauria v. Lieb*, 152 F.4th 549, 552-53 (3d Cir. 2025).  At the summary judgment stage, the Court views the facts in the light most favorable to Abdulla and draws all inferences in his favor.  *See Burns v. Pa. Dep't of Corr.*, 642 F.3d 163, 170 (3d Cir. 2011).

[2] According to Abdulla, Bunul is the property manager for Selina Inc., a sole proprietorship that owns the 1528 Mascher Street property.  *See* Pl.'s Statement of Facts ¶ 2, Dkt. No. 21 at 3.

[3] "Def.'s Ex. B" is the video recording of the 911 call response from Officer Friel's body-worn camera, and is labelled "1528_Mascher_St-_Disturbance_Business FRIEL (284681)."

payment service. *Id.* at 5:30-5:45. He stated the last time he had made a payment was in July 2021, three months earlier, and recounted that when Bunul told him he would have to leave, he pointed out that there was an eviction moratorium in place.[4] *Id.* at 5:55-6:10. Responding to the officers' questions, Abdulla acknowledged that he initially rented the property through Airbnb, but he maintained that after that "first time," he was renting it and offered to show the officers his payments on his phone.[5] *Id.* at 6:12-6:30. He admitted he had not signed a lease and that the 1528

---

[4] The federal eviction moratorium imposed by the Centers for Disease Control and Prevention due to the COVID-19 pandemic was still in effect in July 2021; however, that moratorium ended on August 26, 2021, when the United States Supreme Court allowed a district court order vacating the moratorium to take effect. *See Ala. Ass'n of Realtors v. Dep't of Heath & Human Servs.*, 594 U.S. 758, 759 (2021). In her summary judgment papers, Lt. Pittaoulis suggests the statewide moratorium imposed by the Governor of Pennsylvania remained in effect at the time of the incident at issue in this case in October 2021. Def.'s Mem. 5, Dkt No. 20. But publicly available documents suggest the statewide moratorium extended only through August 31, 2020. *See* Pennsylvania Housing Finance Authority, *Guidance for Rental Residents Affected by COVID-19*, https://www.phfa.org/forms/multifamily_news/news/2020/guidance-for-residents.pdf (last visited Feb. 19, 2026) [https://perma.cc/HB4W-TK47]. In addition, Philadelphia's eviction moratorium appears to have extended only through June 30, 2021. *See* 2021 First Judicial District Annual Report 86, https://www.courts.phila.gov/pdf/report/2021-First-Judicial-District-Annual-Report.pdf (last visited Feb. 19, 2026) (noting "[t]he Philadelphia Municipal Court continued its moratorium on evictions from 2020 through June 30, 2021) [https://perma.cc/3UCZ-FPD4]. Thus, it is not clear there was any eviction moratorium in place when the police were called to the Mascher Street property in October 2021.

[5] In his opposition to Lt. Pittaoulis's summary judgment motion, Abdulla maintains he entered into a verbal contract with Bunul to rent a unit at 1528 Mascher Street for $800 per month for one year with an option to extend the contract for a second year on a month-to-month basis. *See* Pl.'s Statement of Facts ¶¶ 1-3, Dkt. No. 21 at 3. Abdulla has also produced documents showing rent payments he made to Bunul via Zelle for June, July, August, and December 2020 and January, February, March, and June 2021, in amounts ranging from $700 to $900. *See* Pl.'s Ex. A, Dkt. No. 21 at 14 (bank statement showing Zelle payments to Bunul totaling $1,600 in June and July 2020); Pl.'s Ex. B, Dkt. No. 21 at 18 (list of Zelle "rent" payments to Bunul between August 1, 2020 and May 30, 2021; also references a $110 Zelle payment to Bunul on November 25, 2020 with the notation "reservation at North 56th St.," a different property from the Mascher Street property at issue in this case). Abdulla alleges that in addition to the payments reflected in the documents, he made rent payments for September, October, and November 2020 via an Airbnb link Bunul sent to him. Pl.'s Statement of Facts ¶ 7, Dkt. No. 21 at 3. Although the officers did not view this payment information during their encounter with Abdulla on October 8, 2021, the Court assumes

3

Mascher Street address was not listed on his ID. *Id.* at 6:15-6:20, 7:03-7:10. When asked how he got back into the property, Abdulla stated he had called a locksmith. *Id.* at 6:55-7:00. He also explained that Bunul or people working for Bunul had removed most of his belongings from the unit and stated he had received a text message from someone who worked for Bunul advising him that his belongings were at a location near City Line Avenue and that he could claim them there. *See id.* at 7:30-7:55. Abdulla denied striking Bunul, stating the situation had escalated when Bunul aggressively ordered him to leave and attempted to forcibly remove him from his bedroom. *Id.* at 8:00-8:40. He expressed concern about getting his belongings back, including his passport. *Id.* at 8:50-8:55.

After speaking with both parties, the officers called Lt. Pittaoulis, seeking guidance as to the policy for Airbnbs in terms of evictions.[6] *Id.* at 10:45-10:55. Officer Friel explained there was an individual (Abdulla) who "Airbnb'ed a couple months ago," "stopped paying in July," and was saying he had to be formally evicted. *Id.* at 11:15-11:20. Officer Friel stated he was not sure whether Airbnb requires an eviction or is more like a hotel, such that the individual who overstayed would be trespassing. *Id.* at 11:22-11:31. He explained that the complainant (Bunul) stated he had been trying unsuccessfully to get the guest out of the unit. *Id.* at 11:33-11:35. But he did not mention Abdulla's claim that he had been renting the property. The call then ended, and Officer Friel stated Lt. Pittaoulis would call the officers back. *Id.* at 12:00-12:05.

---

Abdulla could have presented at least some of this information to the officers, had they wished to see it.

[6] The officers first called another individual ("Sarge"), but he did not know the answer to their question. Def.'s Ex. B at 9:36-10:20.

While waiting for Lt. Pittaoulis's call, the officers explained to Bunul the issue on which they were seeking guidance, noting that Airbnb is a "gray area." *See id.* at 12:00-12:25. Bunul stated the property was designated as a visitor accommodation, similar to a hotel. *See id.* at 12:25-12:35. The officers requested proof that the property was an Airbnb, which Bunul provided on his phone, displaying what was described in the video as a confirmation of 28-night Airbnb stay for Abdulla with a January 29, 2021 check-out date. *See id.* at 12:35-13:40. Bunul also confirmed that Abdulla had initially paid for the unit through Airbnb.[7] *See id.* at 13:20-13:25.

Officer Friel then received a return call from Lt. Pittaoulis. Based on her advice, Officer Friel stated Abdulla "was out now." Because Officer Friel's body-worn camera captured only his end of the conversation, the exact content of Lt. Pittaoulis's advice is not in the record. Lt. Pittaoulis concedes, however, that she advised Officer Friel that an Airbnb is like a hotel, such that Abdulla was legally trespassing. Def.'s Statement of Undisputed Material Facts ¶ 13, ECF No. 20-1.

After speaking with Lt. Pittaoulis, the officers approached Abdulla and told him he would have to leave the property or be arrested for trespassing, explaining that Airbnb is not the same as renting so an eviction was not necessary. *Id.* at 15:18-15:25. Abdulla continued to maintain he was renting the property, but the officers stated the issue was not up for debate, noting Bunul had provided proof that the unit was an Airbnb. *Id.* at 15:27-15:55. Abdulla again acknowledged he had rented the property as an Airbnb "the very first time," but claimed that after that he had a lease—a verbal agreement with Bunul to rent the property. *Id.* at 16:55-17:05. The officers

---

[7] In response to the officers' question whether Abdulla had paid via Zelle, Bunul stated Abdulla's friend had made an attempt to do it for him a couple of times. Def.'s Ex. B at 12:40-12:50. Bunul's statement is contradicted by the payment records produced by Abdulla.

remained at the property while Abdulla first attempted to call "police advisory" to rectify the situation and then went through the contents of a trash bag retrieved from his room to determine whether any of his belongings were in it. *See id.* at 17:20-28:04. The officers left the scene only after Abdulla left.

Upon leaving the Mascher Street property, Abdulla went to the 26th District, where he spoke with Lt. Pittaoulis, telling her he had been evicted. During the conversation, Lt. Pittaoulis confirmed her understanding that Abdulla had initially rented the property through Airbnb and stayed past his contract date, and she explained that Airbnb is like a hotel room, which the guest is supposed to leave when the stay is over. *See* Def.'s Ex. C at 0:05-0:35.[8] Abdulla maintained that while the property was an Airbnb for other people, he was renting it and had been paying, later stating he had been at the property for two years. *Id.* at 0:10-0:15, 1:37-1:45. When asked whether he had a lease or anything in writing, Abdulla acknowledged he did not, saying the owner told him, "I'm not going to sign any lease with you; just pay and that's it." *Id.* at 0:40-0:50. Lt. Pittaoulis told Abdulla that absent a lease or other documentation, all the police had to go on was the Airbnb information provided to them. *Id.* at 0:50-1:02. She confirmed the property owner could not destroy Abdulla's belongings but stated that unless he had a lease, there was nothing she could do for him at the time because the situation "f[e]ll[] under Airbnb." *Id.* at 1:15-1:20, 2:24-2:34. When Abdulla raised the issue of the moratorium, Lt. Pittaoulis noted his situation was not covered by it. *Id.* at 1:34-1:40. She also advised Abdulla that if he wanted to do anything, he would have to go through landlord-tenant court. *Id.* at 0:35-0:40.

---

[8] "Def.'s Ex. C" is the video recording of Lt. Pittaoulis's encounter with Abdulla at the police station from Lt. Pittaoulis's body-worn camera, and is labelled "615_E_Girard-MC LT PITTAOULIS (230700)."

Following his removal from the Mascher Street property, Abdulla filed a civil action against Bunul and the property's owners (Selina, Inc. and Mohamed Elebeh) in the Philadelphia Court of Common Pleas, seeking to reverse what he contended was an illegal eviction. *See Abdulla v. Selina, Inc., et al.*, Case ID No. 211001723 (C.P. Phila. Cnty. filed Oct. 21, 2021). On November 1, 2021, after a hearing, the state court issued an order granting Abdulla's emergency motion to restore possession and directing the defendants to immediately grant Abdulla full access to and possession of the property pending further court order. Compl. Ex. C, Dkt. No. 2-1 at 5-6.

Abdulla emailed the court order to Bunul the next day and requested via text message that Bunul immediately return his keys, passport, and social security card to him. Pl.'s Ex. C, Dkt. No. 21 at 20. Bunul texted back that the security team and police had been informed and requested that Abdulla "simply follow the legal process if you think you are right." *Id.* Abdulla advised that the Sheriff would be at the property with a locksmith. *Id.* Later the same day, Abdulla reported to the police that Bunul had threatened him by phone, telling him that if he returned to the 1528 Macher Street property, the security team would shoot him. Def.'s Ex. D, Dkt. No. 20-1 at 8. There is no evidence Lt. Pittaoulis had any involvement with this complaint. The incident report was prepared by "P/O Amadon" and was reviewed by a Sergeant whose last name is illegible on the document. *Id.*

On November 4, 2021, the state court granted Abdulla additional emergency relief, issuing an order directing that "the local police or sheriff's department shall assist in the execution of the November 1, 2021 Order, if necessary, with any costs associated with such assistance to be paid by the Respondents." Compl. Ex. E, Dkt. No. 2-1 at 8. The following day, Abdulla attempted to gain access to the 1528 Mascher Street property pursuant to the court's order, and the police were

again called to the property.[9]  A police officer at the scene informed Abdulla that he would only be

allowed back into the property if he was accompanied by someone from the Sheriff's Office.

Def.'s Ex. E at 6:23-6:30.[10]  The officer also advised Abdulla that he would be arrested if he went

back on the premises or broke into the property.  *Id.* at 14:20-15:00.  Although Abdulla alleges the

police who were present at the property were there under Lt. Pittaoulis's supervision, there is no

evidence Lt. Pittaoulis had any involvement in any of the events on November 5, 2021.[11]

According to the docket in the state-court action, the preliminary injunction issued on

November 1, 2021 was later dissolved on December 7, 2021.  *See Abdulla v. Selina, Inc., et al.*,

Case ID No. 211001723 (C.P. Phila. Cnty.) (Dec. 7, 2021 docket entry); *see also* Pl.'s Statement

of Facts ¶ 22, Dkt. No. 21 at 5.

In October 2023, while the state-court action was ongoing, Abdulla filed this federal-court

action against the PPD and Lt. Pittaoulis, alleging his eviction from the Mascher Street property

violated his rights under the Fourth, Fifth, and Fourteenth Amendments.[12]  The Complaint sought

---

[9] The complainant for this incident was Derek Barkley, whose relationship to the 1528 Mascher
Street property is not clear from the record.  *See* Compl. Ex. F, Dkt. No. 2-1 at 9.

[10] "Def.'s Ex. E" is the video recording of the encounter between Abdulla and the police on
November 5, 2021 from the body-worn camera of an officer on the scene.  The video is labelled
"D0057 (1528_N_Marcher_-_Dist_House)."

[11] There is no indication that Lt. Pittaoulis was present at the scene, and the only references to her
by the officers who were present concern her involvement in the incident on October 8, 2025.
Def.'s Ex. E at 9:25-9:50, 17:25-17:35.  Notably, Officer Friel, who was present at the scene on
November 5, stated the Sheriff's Office had given him the same advice as Lt. Pittaoulis—namely,
that an Airbnb is treated as a hotel and does not require an eviction.  *Id.* at 9:25-9:50.

[12] Before filing this federal-court action, Abdulla filed a second state-court action against the City
of Philadelphia and Selina, Inc. in July 2023, seeking "a declaration that the City illegally
backdated the rental and limited lodging operator licenses issued to Selina for [the 1528 Mascher
Street property] from March 1, 2019 through June 13, 2023, so that the Property was not a legally
operated Airbnb."  *Abdulla v. City of Phila.*, 332 A.3d 151, at *1 (Pa. Commw. Ct. Dec. 11, 2024)
(unpublished table disposition).  The complaint in this second action was dismissed for failure to

damages for the constitutional violations, which Abdulla claimed caused him to become chronically homeless and endangered his life during COVID-19 pandemic. Abdulla was granted leave to proceed in forma pauperis, and his claims against the PPD were dismissed with prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii). Dkt. No. 5. After a period of discovery, Lt. Pittaoulis filed the instant motion for summary judgment. She argues she is entitled to qualified immunity as to Abdulla's claims regarding his eviction from the Mascher Street property on October 8, 2021, because there was no clearly established law that an Airbnb rental was legally equivalent to a landlord-tenant lease agreement at that time. To the extent that Abdulla's claims implicate the seizure of his personal property or his encounter with police on November 5, 2021, Lt. Pittaoulis seeks summary judgment on the ground that Abdulla has not shown she had any personal involvement in those alleged constitutional violations. Abdulla has submitted an opposition to the motion.[13]

After briefing of the summary judgment motion was complete, the Court suspended the remaining case management deadlines to permit the parties to participate in a settlement conference, but the efforts to resolve the case were unsuccessful. In the meantime, Abdulla continued to litigate his wrongful eviction action against Bunul, Selina, and Elebeh in state court. On April 7, 2025, the state court conducted a non-jury trial in that action. The court found in favor

---

state a claim in August 2023, and the dismissal was affirmed on appeal in December 2024. *Id.* at *1, 6.

[13] Abdulla's summary judgment opposition makes clear he is not pursuing a claim for seizure of his personal property. Pl.'s Answer Def.'s Mot. Summ. J. 2, Dkt. No. 21. As for the November 5, 2021 incident, although Abdulla asserts "[a] reasonable jury should find . . . that defendant had prior agreement to execute the unlawful eviction based on the second incident," Pl.'s Statement of Facts ¶ 21, Dkt. No. 21 at 5, there is no evidence in the record suggesting Lt. Pittaoulis had any involvement in that incident or was even aware of it. Accordingly, the Court addresses only Abdulla's claims concerning his removal from the Mascher Street property on October 8, 2021.

of the defendants on Abdulla's wrongful eviction claim, noting Abdulla "did not present credible or convincing testimony or evidence to support his contention that he had been subjected to an illegal eviction by any of the named Defendants." *Abdulla v. Bunul*, Case ID No. 211001723 (C.P. Phila. Cnty. Apr. 7, 2025) (order re verdict of non-jury trial). However, the court also found against Bunul on his "New Matter/Crossclaims," noting Bunul "did not present credible or convincing testimony or evidence to demonstrate that Defendant Budo Bunul was entitled to any award of damages for unpaid reservations to AirBNB from Plaintiff." *Id.* Abdulla has appealed the trial court's ruling.

**APPLICABLE LEGAL STANDARDS**

Summary judgment is appropriate "if, when the evidence is viewed in the light most favorable to the non-moving party, 'there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law.'" *Rivera v. Redfern*, 98 F.4th 419, 422 (3d Cir. 2024) (citation omitted); *see also* Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual dispute is "'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

Abdulla brings this action pursuant to 42 U.S.C. § 1983, which "provides a cause of action against any person who, acting under color of state law, deprives another of his or her federal rights." *Wright v. City of Phila.*, 409 F.3d 595, 599 (3d Cir. 2005), *abrogated on other grounds by Chiaverini v. City of Napoleon*, 602 U.S. 556 (2024). "An official sued under § 1983 for an alleged constitutional violation is entitled to qualified immunity unless he (1) violated a constitutional right that (2) was clearly established when he acted." *Stringer v. Cnty. of Bucks*, 141 F.4th 76, 85 (3d Cir. 2025). Courts can address these two prongs of the qualified immunity analysis in any order.

10

*Pearson v. Callahan*, 555 U.S. 223, 236 (2009). "A right is clearly established if 'it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" *Urda v. Sokso*, 146 F.4th 311, 314 (3d Cir. 2025) (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001)). Thus, when presented with a claim of qualified immunity, a court "must examine both the law that was clearly established at the time of the alleged violation and the facts available to the official at that time, and must then determine, in light of both, whether a reasonable official could have believed his conduct was lawful." *Paff v. Kaltenbach*, 204 F.3d 425, 431 (3d Cir. 2000). While there need not be "a case directly on point" for a right to be clearly established, "existing precedent must have placed the . . . constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). "The extant case law must be derived from established Supreme Court and Third Circuit precedent or 'state law and rules' and their interpretation by the highest court in that state when determining the contours of a state-granted right." *Montemuro v. Jim Thorpe Area Sch. Dist.*, 99 F.4th 639, 645 (3d Cir. 2024) (internal citation omitted). "'[T]he party asserting the affirmative defense of qualified immunity' bears the burden of persuasion on both prongs at summary judgment." *Mack v. Yost*, 63 F.4th 211, 227 (3d Cir. 2023) (quoting *Halsey v. Pfeiffer*, 750 F.3d 273, 288 (3d Cir. 2014)).

**DISCUSSION**

Abdulla alleges Lt. Pittaoulis violated his right to be free from unreasonable seizures of property under the Fourth Amendment and his Fifth and Fourteenth Amendment due process rights by authorizing his eviction from the Mascher Street property. As discussed below, to establish a constitutional violation under either theory, Abdulla must show he had a possessory interest in the Mascher Street property. Abdulla claims he had the required interest because he was a tenant of the property, such that he could be evicted only in accordance with the Pennsylvania Landlord

11

Tenant Act.[14]  Even assuming Abdulla was a tenant,[15] his status as such was not clearly established when Lt. Pittaoulis encountered him in October 2021, based on the information available to her at the time.  Lt. Pittaoulis is therefore entitled to summary judgment based on qualified immunity.

As to Abdulla's Fourth Amendment claim, that Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV.  "A 'seizure' of property occurs where there is some meaningful interference with an individual's possessory interests in that property."  *Soldal v. Cook Cnty.*, 506 U.S. 56, 63 (1992) (quoting *United States v. Jacobsen*, 466 U.S. 109, 113 (1984)).

Courts have recognized that law enforcement officers' participation in an unlawful eviction may constitute an unreasonable seizure within the meaning of the Fourth Amendment.  In *Soldal*, for example, the Supreme Court held an eviction in which the petitioners' trailer home was forcibly removed from a rented lot in a mobile home park constituted a Fourth Amendment seizure of the home.  506 U.S. at 58-59, 72.  "[U]nder Pennsylvania law, leaseholders have the same right to possession of real estate as an owner during the term of the lease."  *Ruiz v. New Garden Twp.*, 376 F.3d 203, 206 (3d Cir. 2004).  And while the Third Circuit does not appear to have addressed the issue, district courts within the Third Circuit have interpreted *Soldal* broadly, holding officers' involvement in the eviction of a tenant from a rental property may constitute a Fourth Amendment

---

[14] 68 Pa. Stat. §§ 250.101-250.603; *see also Fraport Pittsburgh, Inc. v. Allegheny Cnty. Airport Auth.*, 296 A.3d 9, 18-19 (Pa. Super. Ct. 2023) (describing the Landlord Tenant Act as "a comprehensive regulatory scheme governing the landlord and tenant relationship," which "sets up the procedure whereby a landlord may repossess [the] premises if he has a right to evict the tenant." (alteration in original) (quoting *Warren v. City of Phila.*, 115 A.2d 218, 221 (Pa. 1955))).

[15] Based on the assertions in his "Statement of Facts" and the documents he provided, the Court is persuaded Abdulla has produced (or could produce) evidence from which a reasonable jury could find he was a tenant of the property.

seizure of the tenant's possessory interest in the residence.  *See, e.g.*, *Rankin v. Smithburger*, No. 12-1373, 2013 WL 3550894, at \*10 (W.D. Pa. July 11, 2013); *Paster v. Henry*, No. 94-4800, 1995 WL 686038, at \*2 (E.D. Pa. Nov. 15, 1995); *cf. Snyder v. Daugherty*, 899 F. Supp. 2d 391, 411 (W.D. Pa. 2012) (recognizing this protection does not extend "to a person who *never* enjoyed the status of a legal tenant of the property").  At least two federal appellate courts have endorsed this view.  *See Dix v. Edelman Fin. Servs., LLC*, 978 F.3d 507, 511-14 (7th Cir. 2020) (suggesting allegations that police officers prevented plaintiff from entering the house where he was a tenant while the landlord removed his belongings, if true, might state a claim for a Fourth Amendment violation); *Higgins v. Penobscot Cnty. Sheriff's Dep't*, 446 F.3d 11, 14 (1st Cir. 2006) (finding plaintiff had "arguably" shown a Fourth Amendment violation where police officer issued plaintiff a no-trespass warning and ordered him to leave property where he claimed to be a tenant);[16] *cf. Soldal*, 506 U.S. at 69 ("[T]he right against unreasonable seizures would be no less transgressed if the seizure of the house was undertaken to collect evidence, verify compliance with a housing regulation, *effect an eviction by the police*, or on a whim, for no reason at all." (emphasis added)).  Consistent with this theory, Abdulla maintains his eviction constituted an unreasonable seizure because it interfered with his possessory interest in the Mascher Street property as a tenant of the

---

[16] In *Thomas v. Cohen*, the Sixth Circuit held officers who escorted tenants from the transitional shelter where they resided in the course of effectuating an eviction were entitled to qualified immunity with respect to the tenants' Fourth Amendment claims, finding it was not clearly established that the eviction was a seizure of property where the government actors did not take physical control over the property in question.  304 F.3d 563, 582-83 (6th Cir. 2002) (Gilman, J., concurring in part and dissenting in part).  While the majority opinion on this issue assumed without deciding that an unreasonable seizure had occurred, a dissenting judge opined that "[e]scorting tenants from their residences in the course of effectuating an eviction . . . satisfies the requirement of 'meaningful interference' with their leasehold interest so as to amount to a seizure of their property."  *Id.* at 572 (Clay, J., dissenting).

property and was effectuated without a court order.  *See* Pl.'s Answer to Def.'s Mot. Summ. J. 2, Dkt. No. 21.

Abdulla also alleges a violation of his rights under the Fourteenth Amendment, which prohibits a state from "depriv[ing] any person of life, liberty, or property, without due process of law."[17]  U.S. Const. amend. XIV, § 1.  To establish a violation of procedural due process,[18] a plaintiff must show "(1) he was deprived of an individual interest that is encompassed within the Fourteenth Amendment's protection of 'life, liberty, or property,' and (2) the procedures available to him did not provide 'due process of law.'"  *Hill v. Borough of Kutztown*, 455 F.3d 225, 234 (3d Cir. 2006).  "State law defines property interests for purposes of procedural due process claims."  *Ruiz*, 376 F.3d at 206.  Protected property interests include possessory interests as well as outright ownership.  *Fuentes v. Shevin*, 407 U.S. 67, 86-87 (1972).  "Due process generally requires notice and a hearing prior to eviction."  *Thomas*, 304 F.3d at 576 (citing *Fuentes*, 407 U.S. at 82).  Like his Fourth Amendment claim, Abdulla's due process claim is based on the contention that he was a tenant of the Mascher Street property and, as such, had a protected possessory interest in the property.  *See* Pl.'s Answer Def.'s Mot. Summ. J. 2, Dkt. No. 21.  He maintains his extrajudicial

---

[17] Abdulla additionally invokes the Due Process Clause of the Fifth Amendment, but that provision is inapplicable here because Lt. Pittaoulis is a state officer.  *See Caldwell v. Beard*, 324 F. App'x 186, 189 (3d Cir. 2009) ("[T]he due process clause under the Fifth Amendment only protects against federal governmental action and does not limit the actions of state officials.").  The Court therefore analyzes Abdulla's due process claim only under the Fourteenth Amendment.

[18] Although the Due Process Clause "contains both substantive and procedural components," *Steele v. Cicchi*, 855 F.3d 494, 500 (3d Cir. 2017), the Court understands Abdulla to be raising a procedural due process claim because his complaints regarding the eviction primarily concern the lack of judicial process surrounding it—i.e., the lack of any "court order," "writ," or "eviction notice," Compl. ¶¶ 3, 6, Dkt. No. 2, and the failure to follow the procedures prescribed in the Pennsylvania Landlord Tenant Act, *see* Pl.'s Answer Def.'s Mot. Summ. J. 9, Dkt. No. 21.

14

eviction from the property deprived him of that protected interest without due process. *See id.* at 2, 9-10.

Without addressing whether the evidence in the record is sufficient to show a constitutional violation, Lt. Pittaoulis argues she is entitled to qualified immunity because the undisputed record shows she reasonably believed Abdulla was occupying the Mascher Street property pursuant to an expired Airbnb agreement and there was no clearly established law holding Airbnb guests have the same eviction rights (or moratorium protections) as tenants.[19] *See* Def.'s Mem. Supp. Mot. Summ. J. 4-5, Dkt. No. 20. Abdulla argues Lt. Pittaoulis's reliance on the alleged Airbnb status of the Mascher Street property is misplaced because the property has never had the licensure required to operate as an Airbnb. Pl.'s Answer to Def.'s Mot. Summ. J. 1, 7-8, Dkt. No. 21; Pl.'s Statement of Facts ¶¶ 27-32, Dkt. No. 21 at 5-6. He alternatively argues that even if the property was an Airbnb, he should be deemed to be a tenant based on the duration of his stay. *See id.* at 8.

As to the first argument, Abdulla now maintains the Mascher Street property was not a valid Airbnb because it lacked the proper licensure. But even if he is correct on this point, his argument does not preclude qualified immunity because undisputed evidence in the record demonstrates that based on the information available to her at the time of the events in question, Lt. Pittaoulis could reasonably have believed the property was an Airbnb. *See Montanez v. Thompson*, 603 F.3d 243, 250 (3d Cir. 2010) ("Qualified immunity applies regardless of whether

---

[19] As noted, it appears the various eviction moratoriums imposed during the COVID-19 pandemic had expired by the time Lt. Pittaoulis encountered Abdulla in October 2021. *See supra* note 4. Even if the statewide moratorium was still in effect, as Lt. Pittaoulis suggests, that moratorium "barred landlords from evicting residential tenants for defaulting on their rent obligations or overstaying the terms of their residential leases." *PCS Chadaga v. Torres*, 252 A.3d 1154, 1158 (Pa. Super. Ct. 2021). Because the moratorium extended only to tenants, the qualified immunity analysis is the same whether the issue is framed in terms of eviction rights or moratorium protections.

15

the government official's conduct results from a mistake of law, mistake of fact, or mistake based on mixed questions of law and fact."). Officer Friel told her so when he called seeking her advice about the policy applicable to Airbnbs with respect to evictions, describing the situation as involving someone who "Airbnb'ed" a unit a couple of months ago, stopped paying in July, and was saying he had to be formally evicted. *See* Def.'s Ex. B at 10:45-11:20. Lt. Pittaoulis reasonably relied on Officer Friel's representations in providing the requested advice. Moreover, when Lt. Pittaoulis later encountered Abdulla at the police station, Abdulla himself acknowledged he had initially rented the property through Airbnb, and he conceded the property was an Airbnb for other guests. Although he maintained he had been renting the property, he admitted he did not have a lease or other documentation of this arrangement.[20] While a lease need not be in writing to be valid,[21] it was nevertheless reasonable for Lt. Pittaoulis to conclude Abdulla had been residing at the property pursuant to an expired Airbnb agreement.

In arguing otherwise, Abdulla faults Lt. Pittaoulis for not verifying that the property had the licensure required to operate as an Airbnb, noting this information is publicly available on the City of Philadelphia's "Atlas" website. Pl.'s Statement of Facts ¶ 32, Dkt. No. 21 at 6; Pl.'s Answer to Def.'s Mot. Summ. J. 7, Dkt. No. 21. He also argues the property could not be an Airbnb as a matter of common sense, as it is located in a residential neighborhood where hotels are not allowed. *See* Pl.'s Answer to Def.'s Mot. Summ. J. 8, Dkt. No. 21. But Lt. Pittaoulis had no reason to

---

[20] Abdulla asserts the body-worn camera footage of the encounter at the police station makes clear that Lt. Pittaoulis refused to look at his phone for proof that he did not rent the property through Airbnb. Pl.'s Answer to Def.'s Mot. Summ. J. 8, Dkt. No. 21. But the video does not show that Abdulla attempted to show Lt. Pittaoulis his payments—or anything else—on his phone. *See generally* Def.'s Ex. C.

[21] *See* 68 Pa. Stat. § 250.201 (providing a lease of real property "for a term of not more than three years" may be "by oral or written contract or agreement").

investigate this issue because, as noted, the Airbnb status of the property was not in dispute given Abdulla's admission that he originally rented the property through Airbnb.

Abdulla alternatively argues that even if the Mascher Street property was an Airbnb, he should be considered a tenant based on the duration of his stay there.  While Abdulla's position may well be correct on the merits, when he was actually a tenant is not the question for qualified immunity purposes.  Rather, the qualified immunity analysis turns on whether the law was *clearly established* that someone in Abdulla's situation was a tenant.  *See Davitt v. Spindler-Krage*, 96 F.4th 1068, 1072 (8th Cir. 2024) (holding officials' entitlement to qualified immunity as to claims they violated plaintiff's constitutional rights by advising police he could be removed from hotel without an eviction turned on whether plaintiff "had a clearly established right as a tenant in his hotel room").

As to this question, the parties have not cited, and this Court has not found, any case law addressing whether and under what circumstances a Pennsylvania Airbnb guest might qualify as a tenant, such that eviction protections would apply.  The Third Circuit has analogized Airbnbs to hotels, characterizing Airbnb and other home-sharing platforms as "residential alternative[s] to traditional hotels for travelers seeking to rent a spare room or property on a nightly, weekly, or monthly basis."  *Nekrilov v. City of Jersey City*, 45 F.4th 662, 666 (3d Cir. 2022).  And Pennsylvania law treats at least short-term Airbnb rentals like hotels in some respects.  For example, Airbnbs and other short-term rental properties are subject to the Pennsylvania hotel occupancy tax for stays under 30 days[22] and the Philadelphia hotel room rental tax for stays of 30

---

[22] The Pennsylvania Department of Revenue website advises that "[u]nder Pennsylvania law, anyone who rents out their property to provide lodging for less than 30 days to the same person must collect and remit the Pennsylvania hotel occupancy tax to the Department of Revenue." Commonwealth of Pennsylvania, *Home-sharing/Third-party Broker Rentals*, https://www.pa.gov/agencies/revenue/resources/tax-types-and-information/sales-use-and-hotel-

days or less.[23]    Short-term Airbnb rentals also appear to be covered by the Pennsylvania

Innkeepers' Rights Act, which applies to "lodging establishments," a term defined to include not

only a hotel but also "[a] building . . . which is held out by any means . . . as being available to

provide overnight lodging . . . for consideration to persons seeking temporary accommodation."

48 Pa. Cons. Stat. § 1311(g).  For purposes of the Act, the term "temporary" means "[o]ccupancy

or the right to occupancy of a lodging establishment for less than 30 days or on a day-to-day basis

if for more than 30 days."  *Id.*  Hotel guests generally lose any possessory interest in a hotel room

once checkout time has passed.  *See United States v. Mendoza*, 163 F.4th 782, 785 (3d Cir. 2026).

Moreover, the Innkeepers' Rights Act gives hotelkeepers the right to "eject a person from the

lodging establishment premises for violating this chapter," including, presumably, for

---

occupancy-tax/home-sharing (last visited Feb. 19, 2026) [https://perma.cc/X5UK-NARW].  This tax applies not only to hotels but "to rentals of rooms, apartments and houses arranged through online or third-party brokers."  *Id.*; *see also* 61 Pa. Code § 38.1(a) (imposing an excise tax of 6% of the rent "upon every occupancy by an occupant of a room in a hotel in this Commonwealth"); *id.* § 38.3 (defining a "[h]otel" as "[a] building in which the public may, for a consideration, obtain sleeping accommodations, including establishments such as inns, motels, tourist home, tourist houses or courts, lodging houses, rooming houses, summer camps, apartment hotels, resort lodges and cabins and other building or group of buildings in which sleeping accommodations are available to the public for periods of time less than 30 days").

[23] *See* City of Philadelphia, *Hotel Tax*, https://www.phila.gov/services/payments-assistance-taxes/taxes/business-taxes/business-taxes-by-type/hotel-tax/ (last visited Feb. 19, 2026) (explaining that the City's hotel tax applies to temporary use (i.e., less than 31 days) of "a guest room in a hotel, motel, inn, bed and breakfast, or any other building in Philadelphia," including "rooms in private homes if the room is reserved for accommodations") [https://perma.cc/XNN2-JE5B]; 19 Phila. Code § 19-2402(1) (imposing an excise tax "on the consideration received by each operator of a hotel within the City from each transaction of renting a room or rooms to accommodate transients"); *id.* § 19-2401(5) (defining a "[h]otel" to include "[a] hotel, motel, inn, guesthouse or other building located within the City which holds itself out by any means . . . as being available to provide overnight lodging . . . for consideration to persons seeking temporary accommodation"); *id.* § 19-2401(12) (defining "[t]emporary" as "[a] period of time not exceeding thirty (30) consecutive days").

18

nonpayment.[24]  *Id.* § 1131(e); *see also id.* § 1131(a)(1) (providing a hotelkeeper "shall have the right to refuse or deny accommodations, facilities or privileges of a lodging establishment to . . . [a] person who is unwilling or unable to pay for the accommodations and services of the lodging establishment").  Given the foregoing, the law points to the conclusion that a short-term Airbnb guest is *not* a tenant entitled to eviction protections.

Abdulla points out that the Innkeepers' Rights Act would not apply to Airbnb stays of 30 days or longer, like the one at issue in this case.  *See* Pl.'s Answer Def.'s Mot. Summ. J. 8, Dkt. No. 21; *see also* 48 Pa. Cons. Stat. § 1311(g); *Williams v. Kusnairs Bar & Tavern*, No. 04-CV-299, 2006 WL 1310360, at *5 (W.D. Pa. May 10, 2006) (holding defendant property owner was not entitled to summary judgment that individual renting a room above his tavern was a boarder under the Innkeepers Act where there was a factual dispute as to whether the plaintiff had paid for the room for more than 30 days).  But even assuming the law was clearly established in this regard, it does not follow that Abdulla was a tenant of the Mascher Street property, much less that his status as such would have been clear to a reasonable officer in Lt. Pittaoulis's position.  Unlike the law in some other jurisdictions, Pennsylvania law does not specify when an occupant of a property will be considered a tenant.  In New York, for example, a statute makes clear that "[a] tenant shall include an occupant of one or more rooms in a rooming house or a resident, not including a transient occupant, of one or more rooms in a hotel who has been in possession for thirty consecutive days or longer."  N.Y. Real. Prop. Acts § 711; *see also Mann v. 125 E. 50th Street Corp.*, 475 N.Y.S.2d 777, 778-79 (N.Y. Civ. Ct. 1984) (holding a person who resided in a hotel for

---

[24] The right to eject guests from the premises applies only if a copy of the Act is posted "in a conspicuous place and manner . . . at or near the guest registration desk."  48 Pa. Cons. Stat. § 1311(e), (f).

four months could not be locked out of her rooms without legal process where there was no evidence to suggest the person was a "transient occupant"), *aff'd*, 126 Misc. 2d 1016 (N.Y. App. term 1985).[25]  Pennsylvania law includes no analogous provision.

Under Pennsylvania law at the time Lt. Pittaoulis encountered Abdulla in October 2021, the existence of a landlord-tenant relationship required an express or implied contract.[26]  *In re Wilson's Est.*, 37 A.2d 709, 710 (Pa. 1944) (holding a landlord-tenant relationship "cannot exist without such contract" and describing a tenant as "one who occupies land or the premises of another in subordination to the other's title, and with his assent, either express or implied" (citations omitted)).  In his interactions with Lt. Pittaoulis, Abdulla admitted he had no express contract with Bunul.  *See* Def.'s Ex. C at 0:40-0:50 (acknowledging he did not have a lease).  He may have had an implied contract based on Bunul's acceptance of monthly payments from him over a period of months.  But even if Abdulla did have an implied contract, it is not enough to overcome qualified immunity.  Under the qualified immunity standard, the right alleged to have been violated must have been "clearly established" at the time of the incident, meaning "it would be clear to a reasonable officer that [Lt. Pittaoulis's] conduct was unlawful in the situation [s]he

---

[25] California law is similar, stating that provisions on "hiring" (i.e., contracting for the temporary possession and use) of real property "shall apply to all persons who hire dwelling units located within this state including tenants, lessees, boarders, lodgers, and others, however denominated," but excepting from the definition of "persons who hire" persons who maintain "[t]ransient occupancy in a hotel, motel, residence club, or other facility when the transient occupancy would be subject to tax under Section 7280 of the Revenue and Taxation Code"—i.e., when the occupancy is for 30 days or less.  Cal. Civ. Code § 1940(a), (b)(1); Cal. Rev. & Tax. Code § 7280(a); *see also* Cal. Civ. Code § 1925 (defining "hiring").

[26] The Landlord Tenant Act did not include a definition of the term "tenant" until 2024, when it was amended to specify that a "tenant" is "a person who occupies the land or premises of another in subordination to the other's title and with the other's express or implied consent, including, but not limited to, oral or written leases or acceptance of rent by an owner or their agent."  68 Pa. Stat. § 250.102.

confronted." *Urda*, 146 F.4th at 314 (quoting *Saucier*, 533 U.S. at 202). Based on the record, the Court cannot say it would have been clear to a reasonable officer in Lt. Pittaoulis's position that Abdulla was a tenant based on the limited information available to her. Because Abdulla was not clearly a tenant, his constitutional rights were not clearly established when Lt. Pittaoulis participated in his removal from the Mascher Street property. The Court therefore concludes Lt. Pittaoulis is entitled to qualified immunity in this case. Accordingly, the Court will grant summary judgment in her favor as to all claims in Abdulla's Complaint.

An appropriate order follows.

BY THE COURT:

/s/ Juan R. Sánchez
Juan R. Sánchez, J.